Mr. Tucker. Good morning. May it please the Court. The primary issue raised by this appeal is whether the trial court erred in its interpretation of the party's contract, and more specifically, did the trial court err in determining that after my client, Emission, refunded the purchase price as the agent for Molecular to the wholesalers who had bought it when it didn't sell, it was entitled to be reimbursed from the manufacturer, which was Molecular. This is a decision, the Court's decision on this is at page 15 and 17 of the opinion, and it's all within the context of the conclusions of law, which is important because that means this Court's evaluation and review is de novo, as it would be in terms of just interpreting the contract generally. Why didn't the district court interpret the contract to include the issuance of charged back credits? I'm sorry? Why didn't the district court interpret the contract to include charged back credits? That's not necessarily an unfriendly question. No, no. The Court ignored that. The Court ignored it. The Court, there were certain critical provisions in the contract that you just can't escape. I mean, one, it does say that the Mission, as the distribution agent, is going to handle both ends of the distribution. On the way out, with invoicing and AR, accounts receivable collection, and on the back end, it specifically says we're going to handle returns and charged back processing. The Court, when it looked at the contract at pages 15 to 17, said there's nobody responsible for handling these returns and paying for the refund, even though the Court says the contract plainly contemplates that there's going to be returns and charged back processing. So what we need to do in terms of the interpretation, since this Court has the ability to de novo review and determine what the proper interpretation is, we need to look at what the critical points of the contract are. First is the agency concept. That's at paragraph B and 2A. It says Mission is the exclusive agent in this relationship. On the front end and on the back end, the exclusive agent. That means Mission is never acting for itself. It's always acting as the agent. The second is the section that deals with the title to the product, and that's 15A, and that says at all times under this contract, title to the property products remains with the manufacturer, molecular. One of the other provisions speaks about this in terms of a consignment relationship. So the importance of that is every time that Mission is acting for molecular, it's acting as its agent for its products, whatever it's doing. Also, the contract is clear, and it says that at 2C, the services that are going to be provided as the agent are processing and handling of returns per the SOWs. SOWs meant statement of work. If you go and look at the statement of work, one of the things it says is we're going to have program implementation. This is where the parties sit down and say, okay, we talked about what we're going to do. Let's talk about how specifically we're going to do it. So it is true at that program implementation that the parties actually discussed how they were going to do this, but that discussion is not memorialized in the contract. You would agree with that? I guess I would put it this way. The contract contemplates, among other things, focused on this issue, is that Mission would be doing the returns and the chargeback processing. The program implementation that's contemplated and specifically one of the things it's going to do is let's talk about the specifics of that. The unrebutted testimony at trial was that the parties sat down over a series of phone calls and actual meetings and said, okay, this is the return policy we're going to agree on. This is the trade letter we're going to send out to all the wholesalers saying we're acting as your agent. And they also talked about chargebacks and that when Mission has to refund an amount because product didn't sell, that this is something that then Molecular would in turn have to refund to them. That was the chargeback. So would you agree that it is necessary for us to look at this parole evidence in order to understand what the contract actually was intended to mean between these parties so that we have to find that it is and let me say, if you look at the parole evidence, which the trial court did also and in one of its other areas, but if you look at the parole evidence rule, then certainly all of the evidence is that the parties understood what was going on. It's a really easy case if you're allowed to look at the evidence. Pardon? It's a really easy case if you're allowed to look at the evidence. But it's, I, sure. Okay. Do you think it's an easy case with just the contract? I think it's an easy case on the contract also. Obviously not as easy. Okay. It's more cryptic than everybody that was involved in this case would like the contract. Well, I guess I want you to answer the first question first. Answer? I think the first question was do you have to look at the parole evidence in order to make a determination. This is why I don't think, Judge, that you have to look at the parole evidence. If you just look at the sections that we talk about, which is Mission is always acting as the agent, this is always their product, and it also says that we, Mission, is going to process returns and handle chargebacks. And if you look at the statement of work, which is part of the contract, it says for the EDI, Electronic Data Interface, how we work in this, it says cryptically, on the front end, they're going to handle receipt of wholesale orders and transmission of invoices. On the back end, returns processing and chargeback management, receipt of chargebacks. I will tell you, if you want to look at this contract and talk about how cryptic it is, they want to come in there and say, and the judge found, there's nowhere in this contract that says that after we pay for a refund, we then charge you and you pay within 30 days. There's no language like that. But the language imports it when you give it its reasonable and appropriate meaning. And if you look at the contract also, Judge, there is nowhere in that contract that says after we do the invoicing, after we collect the accounts receivable, there's not a single word in that contract that says we actually tender the proceeds to the manufacturer. But yet everybody understood by looking, among other things, at the industry terms and usage, right, the context of this, that that's how it works. And you don't have to, the Texas law says that where you, either the court, it's not considered looking at parole evidence if you're simply looking at it to determine the meaning of the words that are used in the contract. For example, if you had an engineering thing and it said you got to do X, Y, and Z, and everybody says, I don't know what X, Y, and Z is, you'd say, well, what it is, just like you would look it up a dictionary. In this instance, the meaning of chargeback. And the chargeback, I think that everybody testified to, is that it is the economic burden ultimately being borne by the manufacturer who owns the product. And if you look at it, again, with do you have to look at parole evidence? If you're the agent, it's your principal's product, and you are acting for them, dealing with a third party, the wholesaler says, you're the intermediary, you're acting as the agent, you have to refund this money, and it's your product, then the law would import the duty to pay, just like it did when we sold the product. Go ahead, sir. I was just going to ask, this chargeback that the wholesaler gets from mission, can that be credited to any other invoices that the wholesaler It can be credited to any of it. So it's not restricted to molecular's product? Mission sells products, a whole host of products to these wholesalers, of which this was only a couple, right, two or three. So we would get an invoice, we would send an invoice to a wholesaler and say, you owe us a million dollars of products we sold, and they'd say, we owe you a million, but we get a credit because we return these products, and that's the chargeback, that's the chargeback or credit that they take, and then we in turn take the chargeback and credit back against them, specific. And early in the relationship, early in the relationship, that happened without objection. The only reason that this didn't work now, if you look at what we'd call the extrinsic evidence, the only reason that this didn't happen and we're here is because they didn't have the money. For three, four months, they said, we will pay you, give us a little bit more time, we're trying to do the financing. They admitted that. Well, but they say they thought they were supposed to do it because you told them they were supposed to do it. That's why they were doing it initially. That was an argument, Judge, raised after the lawsuit was filed. There is not one bit of evidence in the trial record where they said, we don't owe this money. At best, at best, what they have is the principal saying, I need to adjudicate those returns. Everybody used that about every third time he would talk to them. Most of the time, he talked about payments. Sometimes he said adjudicate. And I said, what do you mean when you say adjudicate? Because he's trying to say, I didn't mean to pay. Adjudicate means, I need to look at the return policies. If those were proper returns, then it's adjudicated and I have to pay. So there was no question about that. There's also no question about testimony about, you were trying to get the, can we replenish? Replenish means, let me give you some products so I don't have to pay you. You keep product in stock, but, and don't, so I don't have to refund it to you, but it's old, let me just replenish it. And the wholesalers, we don't want that. The product's not selling. The reason that the trial court's errors were coupled, they said Mission was not acting as the agent. And the reason they said that is they looked at 5F of the contract. 5F says, except as specifically provided herein, neither party shall hold itself out as the agent of the other. That certainly was expressly provided in this contract. That's what it was all about. That's what the trade letter was all about. Second thing is, and neither party shall make or incur a debt in the name of the other. That's speaking to a third party type relationship, where you would go, Mission can't go out and sign a contract or go into a bank and say, you owe me, you know, I'm borrowing money for them. So the judge just got that wrong. What do we do, though, with the fact that this is a full-on non-jury trial with the court made findings? Well, the court, what I pointed out early, Judge, was these errors are in the conclusions of law. These are ones that you can review de novo. So basically what we'd ask you at the end of the day here is to say he got it wrong. He simply interpreted the contract wrong. The plain meaning of the contract, the unambiguous meaning of the contract when you give meaning to the agency, you give meaning to the title of the product, and you give meaning to the industry terms. Is it your position that we can give meaning to industry terms even where there's no ambiguity under Texas law? Under the Texas law, there is case. And it's, look, you can read cases that will say you can do that, and then others will say you can't use that industry terms to change the terms. There's at least one that says you can fill it in with the industry custom in an unambiguous case, right? A Texas Supreme Court case, I think, that's cited here. Right. And there's law that will say you can use extrinsic evidence to complete a contract. This contract itself, by having the implementation meetings, contemplated the parties were going to do just this, complete it. Other error on the title. He said, well, they weren't dealing with your products because he said 15A says title, it says title will stay with the products at all times under the MSA. The court said this wasn't under the terms of the MSA. This wasn't under the terms of the contract because the chargeback was not a transaction. That's just flat wrong. The contract contemplates that they were going to do these returns processing, and to say that when they were doing that very process, whether they have to owe money or not is not under the terms of the contract, is just flat out wrong. And so when you correct those two errors alone, so you'd say, okay, we've got an agent dealing with somebody else's product, acting on their behalf, and refunding monies, it's clear under the law, just as it was clear to them under the law, that just like they get the money, they get it back. Now the court could have been, all the parties could have been a little bit less cryptic, and they probably both will be going forward. Well, let me ask this, because you've said the word cryptic a number of times. Isn't cryptic just another word for ambiguous? And what I, well, here's what I don't understand. You've already said you have an easier case on the parole evidence than you do on the contract itself. Why are you urging your hardest case first with respect to an unambiguous contract instead of saying it's ambiguous, look at the parole evidence, it's easy? Judge Asch, I'm going to take your lead here. That was the second part of my argument, okay? I do think if you find it to be ambiguous, which the trial court said, we look at this contract and it doesn't say anything about who's to pay, whether it's us or them. Now Ben goes and says, I'm going to look at extrinsic evidence. And what does he look at? He looks at the DSAs, the distribution agreements that Mission had with the wholesalers. And so when he turns down that road, then he needs to turn down the road and look at all of the extrinsic evidence. He needs to look at the parole evidence that's related to these parties, not the extrinsic evidence that constitutes maybe an unambiguous contract where there's an express provision that covers it. Exactly. When you're looking at the parole evidence rule, you're trying to determine the intent of these parties and what they were doing between them. And when you look at that, the unrebutted evidence was that the testimony during the implementation meetings by their CEO, we're going to do this, we'll be responsible for it. The creation of the trade letter saying that we're going to do that, Mission is going to do that. The handling of the other terms, other returns. The fact that we had to get, Mission had to get a return authorization from Molecular, which is all in the evidence. Why are we having to get a return authorization for them if it's all on us? The request that we replenish, can we replenish instead of taking it back and giving refunds? Why is that something that they care about? They asked, the testimony was that they asked that the return products be shipped to them. Molecular said, send it to my warehouse. They also talked about how old this product is, because if it's got more than six months' time left, then they can resell it. I thought we bought it, and we're responsible for this. But yet they say that, again. And then, I haven't even talked about the multiple e-mails and the telephone conversations that happened over about a four or five-month period, all of which. They also, they were trying to get the financing. They're going to the potential financing entities and saying, they want to say, let's see your finances. What do they list in their finances? We've got this obligation to Mission, at least for the first return. I said this to Judge Pullian, and I say this to this Court. This reminds me of a case I had years ago where I was arguing about a contract, and at the finish, the judge said, Mr. Tucker, that was a mighty fine argument. It was a mighty fine lawyer argument. But what I'm here today is not to listen to lawyer arguments. I'm here about what really was going on between the parties, and you lose. That's what he told me that day. Here, what happened is, nobody raised this issue. There's no evidence. The only evidence is when the lawyer got involved after the lawsuit, and he says, I don't see anything specific to that. And the judge jumped on that and ultimately decided it wrongly. Let me touch briefly on the quantum merit. Now, do you recognize that you cannot get the quantum merit if you get the other? Correct. Correct. Quantum merit was pled because when they come out with their affirmative defense and say, it's not in the contract, so we say, okay, as an alternative, if it's not in the contract, then equitably we're entitled to, do I think we should recover on that? No, I think we should recover on the contract. If you were to prevail, would you, would you go back for them to do a do-over, or what would happen here? I think that what would happen if we prevail is that this Court needs to say, as part of this de novo review, we interpret the contract to say we're entitled to those reimbursements. And the amount of the And we send it back, are the proceedings consistent with that? Yes. And the amount of the damages are identified, and we all had to do proposed orders. It's 1.8 plus change, and it'll be with interest. But they can't have it both ways, right? It either was in, or it wasn't. My time is expended. I had one point on the quantum merit, if you want me to, or I'll just Well, you raised it, so if Let me make one quick point Well, I'm saying you can save it for rebuttal, is what I'm saying Okay, I will. Thank you You mentioned that you had a quantum merit point, and you've already talked about it a little bit, so, okay. Let's go with Mr. Ingram from Molecular Biologicals Good morning, Your Honors. My name is Andrew Ingram, speaking on behalf of Molecular Biologicals. May it please the Court. This case is controlled by Texas law and by the text of the party's contract, the Master Service Agreement. Throughout the MSA, Molecular never promises to pay for returns. The MSA is a contract for logistics services. It details warehousing, distribution, and bookkeeping services that Michetin would provide for Molecular to help it sell its CaraGel products. The MSA states Mr. Ingram, what is your position on this? Your brief seems to offer a couple of different theories of what's going on. Is it your position that by providing chargeback services, Michetin was responsible for bearing the cost of them, the cost of the returns? Or is it your position that returns were not required, and Michetin offered them of its own accord? Your Honor, the contract is silent about who pays for returns. No one promised to pay for returns in this contract, and emphatically, Molecular did not promise to pay for returns in this contract. The contract does contemplate that returns will occur, but it contains no promise by Molecular to pay for returns, a reimbursed mission. It seems to me that the term chargeback does contemplate that a refund will be issued. Why shouldn't we say that at the very least the contract is ambiguous as to which party bears that burden? In other words, ambiguous that the service being provided is issuing a refund on the manufacturer's behalf versus bearing the cost of the refund. Well, because, Your Honor, the contract does contain references to returns. It contains references to chargeback. But the use of these phrases is not a promise, a very expensive promise to pay for returns or to reimburse for returns. It's pretty expensive for Michetin to have remitted to you all the monies that it got from the wholesalers and then not to expect the reverse when the product doesn't sell, doesn't it? Yes, it is, Your Honor, but we believe that had Michetin withheld those proceeds, it wouldn't have been a breach of contract claim. It would have been perhaps a conversion claim, but certainly Molecular would have been entitled to receive it, but it would not have been a breach of contract claim because this was a logistic services contract. It was to provide what's known. So Molecular was entitled to have the title to the product and the price of the product and never to have any obligation to remit one or the other back to Michetin, you know, to complete a sale or to complete the process of the chargeback. The contract doesn't require Michetin to pay Molecular over the sale proceeds, although if — — out of the goodness of their heart. Well, no, Your Honor. They would have been a conversion claim. Molecular would have been legally entitled to receive those proceeds. If Michetin withheld them, then Molecular could have sued for conversion. What do you do with the argument that the URI case and other cases allow us to consider in the context of an unambiguous contract, industry custom? Well, Your Honor, it's true that industry custom is a form of extrinsic evidence that can be considered to decide whether a contract is unambiguous and if a contract is unambiguous to interpret the contract. Nonetheless, extrinsic evidence cannot be used to supplement or alter an unambiguous contract, which is what we have here in the MSA. There needs to be a You told us there's a gap in this contract, that it's silent on a key point of who's doing this. So why wouldn't the industry custom be a very appropriate filler in for that? Your Honor, silence is not ambiguity. And if — I think it may be helpful at this point to read a quote from a Texas case on that point. The court — Dallas Court of Appeals said, ambiguity results when the intention of the parties is expressed in language susceptible of more than one meaning, not when a contract is silent on a matter. This contract is silent. I'm not saying that it's ambiguous. We were just talking about an unambiguous contract, but that is also silent on a matter. So why isn't the industry custom relevant in that context? The industry custom can be used to interpret the language that's there. It cannot be used to alter or supplement the language that's there. I believe, Your Honor, I would refer to the Kachina pipeline decision from the Supreme Court. In the Kachina pipeline case, the court first said, quote, we do not doubt that producers often contract to share in such costs. That's identifying a custom. But then the court went on to conclude, industry custom cannot impose obligations beyond those within the written agreement. I guess, for me, you got paragraph 5F, which says that neither party can act as the other party. That's what 5F says. And then 2A carves something out and says that specific carve out for third party logistic services. And then that's what mission gets to do. So it gave mission the responsibility to act as molecular's agent in all logistic services. Logistics matters. And these charge bags were logistic matters. We agree on that? No, I do not agree, Your Honor, respectfully. This is a contract for services. The effect of the general disclaimer of an agency relationship is to say there is no legal agency relationship here. There's no legal agency relationship, and it's really a contract for services. And if there was doubt on that point, Your Honor, I think the additional language that goes along with that agency disclaimer, that neither party can incur a debt or obligation on behalf of the other, would control the issue and prevent mission from utilizing the reference to logistic services. So the phrase except as specifically provided herein, what does that mean? Well, Your Honor — It says because you can't be neither party can be the other party's agent except as specifically provided herein. So it was referring to some other part of the contract? Well, Your Honor, if — for the sake of argument, if the mission is molecular's limited purpose agent, it doesn't profit mission anything ultimately because of the language disclaiming a right to impose an obligation as mission has purported to do by accepting the returns from the Big Three. And so this receipt of chargebacks and this chargeback management that's referred to in the MSA, you're saying that's not talking about refunds? That is talking — well, chargebacks can include credits on return products. It can also include rebates and coupons and those sort of things that the Big Three might claim. However, managing that, handling that bookkeeping, handling that accounts receivable, that is one of the logistic services being provided. And handling those services is distinct from any obligation that Molecular might have to reimburse mission for returns. What do we do with Molecular's principal Arturo Martinez's numerous statements that Molecular was responsible for reimbursing mission for chargebacks and that he indicated several times that Molecular would reimburse mission once it obtained financing? He's the head of Molecular, so it's not some random guy gone rogue who's dealing. It seems like that would be some bad evidence on your side of the ledger. Yes, Your Honor. A few responses. First of all, that's all post hoc evidence. So that's not the kind of extrinsic evidence we could consider as linguistic aid, evidence of industry custom. That would be parole evidence. So to even get to that evidence, one would have to find that the contract is ambiguous and consider the parole evidence. There are implementation meetings. Isn't that part of the logistics process, to have an implementation meeting? So that's work under the contract. It's not fighting about the contract afterwards. Your Honor, that's also, though, evidence after the contract has been consummated. So that would also be parole evidence, Your Honor. And so unless this Court finds that the contract is unambiguous, which we submit that it's not, the district court was correct about that, we wouldn't reach that evidence. But furthermore— But if we don't reach that evidence and we find it's ambiguous, why isn't that a reason to send it back alone? Well, furthermore, well, this case did—is before us after a full-blown bench trial. The district court did ultimately hold that the contract was unambiguous. It construed it as a matter of law and found that Molecular had no obligation to pay for returns. But the district court also— Are you saying, though, on it—I mean, are you saying Mr. Martinez didn't say this and we'd have to find by clear and convincing evidence and that he didn't really say this? Or are you admitting that he said these things? Your Honor, he said those things. Okay. But furthermore, if we are into the parole evidence, if we do get into the parole evidence, the district court did make credibility findings. It did make findings of fact. Do those have anything to do with the fact that Mr. Martinez said these things? Yes, they are. Because the district court is entitled to weigh the evidence. Under clear review, this court should affirm the district court's conclusions so long as the district court's conclusions are plausible on the record as a whole. The district court considered everything in the record, and this is what the district court found. When you peek behind the curtain, when you look at what really happened with the parole evidence, the district court found that it would have been normal for a manufacturer in Molecular's position to have its own contracts with the Big Three. Those contracts would have required Molecular to pay for returns to the Big Three. Mission did not, that did not happen in this case. Molecular did not have its own contracts with the Big Three. It had no obligation to reimburse them for returns. And Mission did not obtain a promise from Molecular in its contract with the Big Three that they would have to pay for returns to the Big Three. Did Mr. Martinez keep doing the job, and he ratified that obligation? Didn't he ratify that obligation by saying, I'm in the implementation meeting, and I'm going to tell you that I'm going to pay for that? So to keep them to do the deal, this is to make sure that they distribute the product, get the product and stuff. And they wouldn't have done that. They would have stopped right there if he'd have been in that implementation meeting and said, whoa, whoa, whoa. No. Well, Your Honor, the implementation meeting was before any returns were sought. Right. And that's what I'm saying. If he hadn't have given those assurances at the implementation meeting, then they wouldn't have gone on and had all these return issues. They would have stopped the deal, wouldn't they have? Well, Your Honor, I'd like to stress that when we're looking at the parole evidence and we're looking at the implementation meeting or we're looking at Dr. Martinez's statements where he mistakenly believed that he had to pay for returns or Molecular had to pay for returns, this is part of the evidence. And the district court heard all the witnesses, it weighed the evidence, and it found that even considering the parole evidence, there was no obligation for Molecular to pay for returns. We have to remember, Your Honors, that just because we've gotten the parole evidence, the text of the contract doesn't go out the window. The text is still what we're going to interpret in light of the parole evidence. And the district court and its findings of that contract stressed what I described a few moments ago, Your Honors, which is that what was peculiar about this situation, where everything went wrong from Mission's perspective is that Molecular had no contract with the Big Three, and Mission did not protect itself by having an obligation to pay for returns in its MSA with Molecular. But Molecular had no contract with the Big Three because Mission, they carved out an exception and handed that responsibility over to Mission. Isn't that why they didn't have a contract with the Big Three? I mean, without the Big Three, they wouldn't have been moving the product. Well, Your Honor, it's typical for, the testimony was that it was typical for the manufacturer to have its own contract with the Big Three, even if it was using a company like Mission for what's called 3PL, third-party logistic services, in which case, you know, at the trial, the Mission's role, the 3PL role was compared to that of FedEx. Some manufacturers were said to have used FedEx for their 3PL services. So the sales are really from Molecular to the Big Three. It's simply that Mission was contracted to provide 3PL services. And furthermore, Your Honors— Provide what kind of services? 3PL services, the logistic services to provide warehousing, shipping, and bookkeeping, which would encompass the chargeback services, management services, Your Honor. So if I'm understanding what you're saying, you're saying that Mission has a responsibility to do the bookkeeping regarding product returns through the chargeback process, but there was no obligation on anybody's part to let the dollars follow the bookkeeping? That's correct, Your Honor. Normally that role would be—when we go to the parole evidence and we want to find out what will peek behind the curtain, Your Honor, what normally would take care of that, Your Honor, is the separate contract between the manufacturer, the person in Molecular's position in the Big Three. We just don't have those contracts here, Your Honor. If there were such contracts, Your Honor, if Molecular had obligations under its Mission paying for these returns would have been paying Molecular's debt, and Mission would have perhaps a good claim in equity against Molecular, but that's not the facts we have here. Your Honors, I'd also like to stress, and the District Court stressed in its findings of fact, that Mission did not just do 3PL services. 3PL services were only a part of its business, and its relationships with the Big Three were very important to it. The District Court found that the Big Three had business incentives and contractual obligations to pay—Mission had business incentives and contractual obligations to pay the Big Three for returns. So Mission was in a tight spot when it found itself with a business partner in Molecular that had no of the usual contracts with the Big Three, and Mission did not secure in its contract with Molecular an obligation to pay for returns. But that's again all looking at the parole evidence, Your Honor, and I'd stress that this is how the District Court, who heard all the testimony—this is what the District Court took away from all that testimony and found—that's how Judge Pulliam interpreted the contract after he heard all the testimony. Do you have anything further, Mr. Ingram? Yes, Your Honor. So when it comes to the argument about title, yes, the contract does say that title at all times under this agreement shall be in Molecular, but as the District Court rightly found, the payment of returns by Mission to the Big Three, that was not under this agreement. So that is an important obligation in Molecular to now pay for the returns. Yes, if there are no further questions, I yield the rest of my time back to the Court. Thank you, Mr. Ingram. We have your argument. Judge Ash, let me see if I can address your—why I say it's ambiguous. I'm not trying to push a rock uphill if I can let it go down. But the point is, if you're in the industry, like Mission, this is your contract. Everybody knows what's going on, and that's why, consistent with your point, Judge Everett, you can look to the context, the commercial context, and say what does it mean without, you know, considering that parole. Counsel said that Judge Pulliam weighed all this evidence, looked at all this evidence and made his decision, so he discounted all that parole evidence. At page 17, second paragraph, the Court therefore finds the contract unambiguously does not Because the contract is unambiguous, the Court does not consider Mission Pharmacol's evidence of industry practices or extrinsic communications before or after. He didn't do what counsel said he did, which is weigh this. But what the Court did, and then in the next couple of sentences it says, but we do look at the DSAs, the distribution agreements, and that puts that burden on Mission. Mr. Ingram, there's one thing that concerns me, and maybe you can tell me why I shouldn't be concerned about it, and that is that when Mission gets the chargebacks, they can be, that credit can be used by one of the big three to satisfy any invoice, not just molecular products, but it could be, that chargeback, that credit could be used on any other invoice. So Mission then certainly has some incentive to maintain its good relationship with the chargeback credits, that you're getting a chargeback based on having bought molecular's product, but you can use that chargeback on any other invoice. I shouldn't be concerned about that? There's no credit. There's no question but that Mission wants to keep a customer happy, right? Our CEO testified to that. The point is, the credits and the chargebacks were accurate. Nobody questioned that, wait a minute, there wasn't any returns. These returns didn't happen. These returns, nobody questioned it. So I leave the Court with this. The guiding principle in contract interpretation, which this Court has to do now, because it's a de novo, is to give meaning to the party's intent, and to give meaning to all the provisions. When you look at handling returns, you look at chargeback, when you look at who has, you're acting as an agent, when you look at who's the title, the only meaning that can happen here in this context is that Mission is entitled to its reimbursement because of its actions as an agent. Thank you. Thank you. We have your argument. Thank you, Mr. Tucker. Thank you, Mr.